Robert E. TUCKER and Peter
Marx, Plaintiffs,

v.

DEFENSE MAPPING AGENCY HYDRO-
GRAPHIC/TOPOGRAPHIC CENTER
and Local 1884, American Federation
of Government Employees, AFL–CIO,
Defendants.

Civ. A. No. 84–0387–S.

United States District Court,
D. Rhode Island.

April 29, 1985.

Richard B. Applebaum, Mitchell Riffkin, Rosedale & Riffkin, Providence, R.I., for plaintiffs.

Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for Defense Mapping Agency Hydrographic/Topographic Center.

Gay Snyder, New Brunswick, N.J., Mark Roth, Washington, D.C., Letts, Quinn & Licht and Steven Linder, Providence, R.I., for Local 1884, American Federation of Government Employees, AFL–CIO.

## OPINION AND ORDER

SELYA, District Judge.

The plaintiffs, Robert E. Tucker and Peter Marx, both disgruntled workers, have sued their employer, Defense Mapping Agency Hydrographic/Topographic Center (DMA), and their union, Local 1884, American Federation of Government Employees, AFL–CIO (Local 1884 or the Union), asserting a potpourri of remonstrances arising out of a temporary change in the hours of duty policy which prevailed at their place of employment. The plaintiffs have attempted to invoke this court's federal question jurisdiction. 28 U.S.C. §§ 1331, 1346. Tucker and Marx seek recompense for forfeited leave time: $1,320 for Tucker and $110 for Marx. They also pray for exemplary damages, attorneys' fees, and costs. The defendants variously contend that the plaintiffs have failed to exhaust administrative remedies; that the court lacks subject matter jurisdiction; that the action is time barred; and that, in all events, the plaintiffs' jeremiad is utterly meritless.

## I. TRAVEL.

The plaintiffs filed suit in this court on July 24, 1984. After much procedural skirmishing (none of which is germane at this moment), the plaintiffs filed an amended complaint. They postulated a myriad of claims, *e.g.*, breach of the covenants of a collective bargaining pact; transgressions of federal labor law; infidelity to the duty of fair representation; deprivation of due process and of rights secured by the United States Constitution, Amendments V and XIV; and, for good measure, a pendent claim (never seriously urged or sensibly articulated) of abrogation of rights ceded by the Rhode Island Constitution.[1] The defendants answered and lost little time in moving for summary judgment.

This court has adopted a Local Rule in a prophylactic effort to clear the air when summary judgment initiatives take wing. *See* D.R.I.L.R. 12.1. In this case, that rule was honored more in the breach than in the observance. So, when oral argument was first heard on January 30, 1985, the record was murky. Unwilling to venture forth into such a Serbonian Bog, the court suspended arguments and directed that the parties undertake supplemental filings aimed at identifying what (if any) genuine issues of material fact lurked in the shadows. *See Tucker v. Defense Mapping Agency Hydrographic/Topographic Center,* No. 84–0387 (D.R.I. Feb. 12, 1985) (order specifying further compliance with Local Rule 12.1).

The parties complied with this mandate, each essaying appropriate incremental filings. Oral argument was resumed and completed on March 18, 1985. The court took the motions for *brevis* disposition under advisement. And, this rescript com-

---

1. Though the plaintiffs also asserted a cause of action under 42 U.S.C. § 1985(3), this claim has since been pretermitted and is no longer before the court.

prises the court's findings and conclusions in respect thereto.

## II. THE SUMMARY JUDGMENT STANDARD.

The law is settled beyond peradventure as to the composition of the Fed.R.Civ.P. 56 yardstick by which the instant motions must be measured. To honor such a motion, the nisi prius court must be fully satisfied that there is no bona fide dispute as to any material fact issue and that the movant is entitled to relief as a matter of law. *Advance Financial Corp. v. Isla Rica Sales*, 747 F.2d 21, 26 (1st Cir.1984); *Gonsalves v. Alpine Country Club*, 563 F.Supp. 1283, 1285 (D.R.I.1983), *aff'd*, 727 F.2d 27 (1st Cir.1984). In so doing, the district judge must view the evidence in the light most beneficial to the nonmovants, *Isla Rica*, 747 F.2d at 27; *Stepanischen v. Merchants Despatch Transportation Corp.*, 722 F.2d 922, 928 (1st Cir.1983), drawing therefrom all reasonable inferences in their favor. *Isla Rica*, 747 F.2d at 27; *Santoni v. Federal Deposit Insurance Corp.*, 677 F.2d 174, 177 (1st Cir.1982). "In short, relief under Rule 56 is available only if the movant has demonstrated that the tracks are clear and that they run only in one direction." *Railroad Salvage of Connecticut Inc. v. Railroad Salvage, Inc.*, 561 F.Supp. 1014, 1018 (D.R.I.1983).

At bottom, the case at bar raises delicate issues of, inter alia, preemption, exhaustion, and limitations in the federal employment sector. Inasmuch as the litigation turns on jurisdiction and timing, the particular facts of the brouhaha, taken in actual context, are of critical importance. The court gleans the factual predicate necessary for its decision from the pleadings, affidavits, documentary proffers, and D.R. I.L.R. 12.1 statements, taken in their ensemble, relying in the first instance on un-

controverted facts. Contested but irrelevant facts have been winnowed out.[2] Where, and to the extent that, discrepancies exist, the court has viewed any such amphibolous material in the light most hospitable to the nonmovants. In this spirit, then, the court recounts the salient facts of record.

## III. FACTS.

DMA is an independent federal agency within the United States Department of Defense. Tucker and Marx are and were employed by DMA as nonsupervisory employees. Local 1884 has been, at all times material hereto, the exclusive representative of a bargaining unit comprised of all nonsupervisory employees of DMA (including the plaintiffs).

In October of 1981, Local 1884 and DMA entered into a collective bargaining pact (the Agreement) which remained in effect throughout the currency of the events described below. Article XVII of the Agreement, entitled "HOURS OF DUTY," stipulated in pertinent part that:

> The basic work week will consist of five daytime tours, beginning at 6:00 a.m. and ending at 5:30 p.m. An employee may work his/her eight hour tour at any time between 6:00 a.m. and 5:30 p.m.

> \* \* \* \* \* \*

> A tour of duty will not be established or modified solely for the purpose of avoiding the payment of holiday, premium, or overtime pay.

> It is agreed that when shifts are to be changed, a minimum notice of 15 days will be given to each employee affected.

> \* \* \* \* \* \*

> Any changes mutually agreed to in either the day or hours of duty, during which work is required, will continue for

---

**2.** It is apodictic that a motion for summary judgment cannot be stymied by the mere presence of a dispute over fact issues. There must be a *genuine* issue of *material* fact. *See* Fed.R. Civ.P. 56; *see also Over the Road Drivers, Inc. v. Transport Insurance Co.*, 637 F.2d 816, 818 (1st Cir.1980); *Mack v. Cape Elizabeth School Board*,

553 F.2d 720, 722 (1st Cir.1977). And, neither colorful fulminations nor empty rhetoric in the form of self-serving conclusions can create a triable issue when the unadorned facts point with sagittal precision to but a single target. *Railroad Salvage*, 561 F.Supp. at 1018.

a minimum period of at least one pay period.

*Id.* at §§ 1(b), 2(a), 2(b), 5.

Early in 1983, DMA's Rhode Island offices were undergoing renovations. On April 18, 1983 Local 1884 and DMA entered into a memorandum of understanding which temporarily changed the timing of the employees' tours of duty. The modification required workers to conclude their business by 4:30 p.m. (instead of 5:30 p.m., as had theretofore been the case), and meant that they had to start work by 8:00 a.m. (not 9:00 a.m., as had been prior practice) to complete their daytime tours. DMA furnished written notification of the provisional rule to all employees on May 5, 1983.

The plaintiffs were unhappy with the shift in hours. On or about May 11, Tucker informed his first level supervisor, William Merola, that he intended to file a grievance. At about the same time, Tucker discussed his putative grievance with his second level supervisor (in Merola's presence). Some five days later, Tucker filed a written grievance with Merola; though received, it was neither allowed nor denied in so many words at the first step. Instead, Merola told Tucker that the grievance could not be handled at that plateau; he would forward it to Oliver Charlebois, the second level supervisor.

Merola accomplished the promised transmittal to Charlebois by letter dated May 16, 1983. Within a day or so thereafter, Tucker personally filed a grievance with his second level supervisor. On May 26, Charlebois acknowledged receipt of the grievance and stated that it had been given to "the responsible union official." On its face, Charlebois' letter does not purport to be a disposition of Tucker's grievance; instead, it notes the need for some inevitable inconvenience because of the renovations. The plaintiffs contend that, on May 26 or thereabouts, Charlebois gave a copy of the grievance to Local 1884; the union disclaims any such supposed fact. But, Local 1884 admits that Charlebois had received Tucker's step two grievance.

The full extent of Tucker's attempts to seek union assistance remains nebulous on this record. Local 1884 and DMA both claim that Tucker never specifically invoked union assistance. And, there is no direct evidence to the contrary. Charlebois, in his affidavit, maintains that Tucker affirmatively eschewed Local 1884's aid. But, much of this uncertainty is beside the point. What is crystal clear is that no further action was taken by either DMA or Local 1884 on Tucker's grievance, and that Tucker never pressed for such attention.

While Tucker was fiddling, Marx, too, took bow in hand. On May 5, he lodged a first-step grievance with Merola. Marx concedes that he did not push this grievance, personally, with any local 1884 official, but he claims that Charlebois, in an "informal" meeting, indicated that he would forward the remonstrance to a suitable union official. Marx claims that, later the same day, William Trzyzewski, a Local 1884 representative, handed Marx's grievance back to him with the pithy observation that "it was going nowhere". Though the Union terms this account apocryphal, the court, for the limited purpose of Rule 56 consideration, accepts the plaintiffs' version. Later in time, Marx met with Local 1884 representatives concerning the merits of the grievance. Marx relates that Trzyzewski and Larry Zambaranno, another Local 1884 plenipotentiary, stated in substance that when Louis Federico (president of Local 1884) strikes an accord with an employer, "that's the way things are going to be."

It is undisputed that Trzyzewski told Marx that no Local 1884 representative had read Marx's grievance (though Trzyzewski knew that it dealt with the shift in duty hours). The Union representatives did explicate, for Marx's benefit, the etiology of the altered work schedule and the underlying considerations which made it desirable. Marx believed that Local 1884 had dug in its fraternal heels and had made it clear that the change in the duty hours policy would not be rescinded. By his own admission, he indicated to the union brass that he

accepted their explanations supporting the adoption of the new policy. But, Marx now contends that he never formally withdrew his grievance (nor did he ever authorize anyone else to do so on his behalf). Be that as it may, he did nothing to pursue it further.

Most assuredly, this was not the end of the matter. The modification remained in effect for a brief period of time (May 9, 1983 to October 16, 1983, inclusive). Tucker and Marx observed the new quitting time, but reported for work, late, at the more gentlemanly hour to which they had become accustomed under the former policy. And, though their pay was not docked, the truncated hours which they worked in consequence of their retinence resulted in debits against their respective accumulations of leave time. The dollar value of the accrued annual leave recaptured from Tucker was roughly $1320; Marx's "loss" was even less ($110). Duty hours reverted to the previous norm on October 17, 1983 and have remained stable ever since.

Despite the appearance of substantial factual controversy, the pivotal facts are not contested. Thus, no one disputes that the workers' complaints never reached step three or step four of the grievance process (*see* text *post* at Part IV); that neither plaintiff demanded (or received) a written decision at step two; that neither Tucker nor Marx requested that the Union pursue their grievances with the DMA Activity Director or at arbitration; that Marx filed no unfair labor practice (ULP) charge (*see* text *post* at Part V); and that Tucker, although he did file one, voluntarily elected to let it drop by the wayside. The currency and terms of the Agreement, and its applicability to both plaintiffs, cannot be gainsaid. Likewise, the chronology of events is uncontroverted, as is the overriding fact that both of the plaintiffs held federal sector jobs subject to the strictures of the Civil Service Reform Act of 1978 (CSRA), Pub.L. 95–454, 91 Stat. 1111 (1978).

Further facts, to the extent material, will be alluded to in the pages which follow.

## IV. THE GRIEVANCE PROCEDURE.

The Agreement, in Article XXI thereof, explicates an integrated system for processing grievances. It provides, inter alia:

*Step One* —An employee shall first present his/her grievance either orally or in writing to his/her immediate supervisor within 15 working days of the date of the incident giving rise to the grievance, or within 15 working days of the date the employee reasonably became aware of the incident. If presented orally, the employee will indicate that the discussion is under the provisions of the negotiated grievance procedure. If in writing, the employee will utilize the Grievance form (Appendix A). An employee may present a grievance concerning a continuing practice or condition at any time. The Union representative, who will be the appropriate steward, may be present if the employee so desires. It will be the employee's responsibility to procure a Union representative. The supervisor will give his/her answer within five working days after the meeting with the employee. The Union and the Activity anticipate that the majority of employee grievances will be settled at this informal level. In the event an employee objects to the presence of the Union, and a settlement is reached with the supervisor involving the terms of this agreement, the Union will be given the opportunity to be present.

*Step Two* —If no satisfactory settlement is reached at Step One and employee elects to pursue his/her grievance, the employee shall submit the grievance in writing using the Grievance form ... to the second level supervisor within five working days of receipt of the immediate supervisor's decision. The written grievance should include the date of the Step One decision and should identify the immediate supervisor. The second level supervisor will meet with the employee and one Union representative in an attempt to resolve the grievance within five working days of receipt. A written decision will be given to the employee within five working days of the meeting.

*Step Three*—If the grievance is not settled at Step Two, the Union representative may, within five working days, forward the grievance to the Activity Director for further consideration. The Director will review the grievance, consult with the second level supervisor and the Union representative, and then give the Union his/her written answer within ten working days after receipt of the grievance.

\*    \*    \*    \*    \*    \*

*Step Four*—If a satisfactory settlement has not been reached at the previous step, the Union has three work days after the Step Three decision to choose, in writing, to use the procedures prescribed in Article XXII—Arbitration. The Union shall direct the written notice of intent to invoke arbitration to the Activity Director.

Failure of the Activity to meet the time limits prescribed above shall permit the employee or the Union to move the grievance to the next step of the grievance procedure. Failure of the employee or the Union to meet the time limits prescribed above shall constitute withdrawal and termination of the grievance.

*Id.* at §§ 8, 9.

The plaintiffs' ululations rest on alleged violations of the Agreement. First, Tucker and Marx note that the change in policy was announced on Friday, May 6, 1983 and became effective on the next regular work day. (Monday, May 9). The requisite 15 day notice of the change of policy, Agreement at Art. XVII, § 2(b), quoted *ante* at p. 1234, was not given to the workforce. Second, the plaintiffs contend that Local 1884

and DMA were not authorized to disregard proper rituals for amending the Agreement, *id.* at Art. X, § 2,[3] in respect to the hours of duty policy by reason of the window provided by Art. XVII, § 5 (quoted *ante* at p. 1234). And, in the claimants' view, the defendants' neglect to observe the niceties of the Agreement operated both to excuse Tucker and Marx from cultivating the anodyne of the grievance procedure and to insulate them from retaliation for their disdain of the new rule.

## V. UNFAIR LABOR PRACTICES.

Article XXVI of the Agreement must also be factored into the mix. Consonant with 5 U.S.C. § 7116, the Agreement defines unfair labor practices by DMA, Art. XXVI, § 2(a), and by Local 1884. *Id.* at §§ 2(b), (c). On November 1, 1983, Tucker filed an ULP charge with the regional counsel of the Federal Labor Relations Authority (FLRA). But, the battle was never truly joined: on January 25, 1984, Tucker voluntarily withdrew his ULP before any decision on the merits was rendered. Marx abjured any filing whatever with the FLRA.

## VI. LIABILITY OF THE EMPLOYER.

The farrago of federal and state law claims asserted by the plaintiffs must, at the threshold, be assessed in light of federal sector management/labor relations law. DMA (the employer) and Local 1884 (the union) stand before the court in arguably different postures. Therefore, the claims must be considered separately as against each of the defendants. The court first scrutinizes the potential liability of DMA.

---

**3.** Art. X, § 2 of the Agreement provides;

By mutual consent of the parties, this agreement may be opened for amendment which may be required by changes by law. Any request for amendment shall be in writing and must be accompanied by the proposed amendment or amendments. Within ten workdays, which may be extended by mutual agreement, of receipt of such request, representatives of the Activity and Union will meet to negotiate the matter and no changes other than those covered by the proposed amendment(s) shall be considered. Agreement shall

be evidenced by written amendment duly executed by both parties. Final approval of supplements to this agreement remains as agreed, unless there is a violation of law.

But, Art. XVII, § 5 states that;

Any changes mutually agreed to in either the day or hours of duty, during which work is required, will continue for a minimum period of at least one pay period.

The plaintiffs assert that § 5 incorporates § 2 by means of the phrase "mutually agreed". They thus claim that the temporary change was subject to Art. X, § 2 constraints.

### 1. Preemption: The Civil Service Reform Act

■ At the threshold, the plaintiffs' claims raise questions of preemption in the federal sector. Preemption doctrine typically arises in the context of federal lawmaking which, by virtue of the Supremacy Clause, preempts similar and overlapping state laws. *See, e.g., Brown v. Hotel and Restaurant Employees and Bartenders, International Union Local 54,* — U.S. —, 104 S.Ct. 3179, 3185–86, 82 L.Ed.2d 373 (1984); *South-Central Timber Development, Inc. v. Wunnicke,* — U.S. —, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984) (Commerce Clause); *United Nuclear Corp. v. Cannon,* 553 F.Supp. 1220, 1229–30 (D.R.I.1982). Under *Brown,* state law must endure three tests to survive the threat of federal preemption. First, Congress must not have "adequately indicated an intent to occupy" the field. 104 S.Ct. at 3185. Second, state law must not "conflict" with federal law. *Id.* at 3186. Third, state law must not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). The intent to preempt can be implied by a pervasive statutory and administrative mosaic, *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973), or can be inferred if the subject matter of the statute by its very nature requires uniform national regulation. *Florida Lime & Avacado Growers, Inc. v. Paul,* 373 U.S. 132, 142–44, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 1210 (1963). *See generally United Nuclear Corp.,* 553 F.Supp. at 1230.

■ These preemption principles are similarly applicable in this case where other, less issue-specific, federal law is at issue. *E.g., Carlson v. Green,* 446 U.S. 14, 18–20, 100 S.Ct. 1468, 1471–1472, 64 L.Ed.2d 15 (1980). Congress has been silent on the issue of whether it intended that CSRA should supercede all other re-

medial avenues; thus, preemption analysis, as a form of statutory construction, presents a particularly useful approach in the circumstances at bar. It becomes necessary to inquire, therefore, whether it can fairly be said that Congress meant the CSRA entirely to occupy the field of federal sector labor relations. If so, the mandate of exclusivity must be honored. *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959); *United States v. Martinez,* 686 F.2d 334, 342 (5th Cir.1982). And, even if such an intention is not demonstrably apparent, the preclusive effect of the CSRA would be the same if the unrelated federal remedies which the plaintiffs attempt to assert here are at cross-purposes with the CSRA or bar the due attainment of its ends. *Cf. Brown,* 104 S.Ct. at 3186; *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The court turns first to the statute itself and to the circumstances of its passage. On October 13, 1978 Congress enacted the CSRA. Title VII of the Act, codified at 5 U.S.C. §§ 7101 *et seq.,* embraced labor/management relations in the federal sector. It allowed collective bargaining of exactly the sort which resulted in the negotiation of the Agreement between Local 1884 and DMA. And, the CSRA specifically provided for two avenues of dispute resolution for the kind of disagreements at issue here. One road winds through the grievance procedure and pauses at binding arbitration; exceptions can be taken to the FLRA. 5 U.S.C. §§ 7121, 7122. The other route contemplates the filing of an ULP charge with the FLRA. 5 U.S.C. § 7116(d). Judicial oversight of either course is both prescribed and proscribed by 5 U.S.C. § 7123. The power of review is severely limited and by its very terms requires exhaustion of the administrative process: "Any person aggrieved by any final order of the [FLRA] ..." may "... institute an action for judicial review ..." in any appro-

priate United States Court of Appeals. 5 U.S.C. § 7123(a).[4]

Congress clearly intended CSRA to be the primary mode of vindication of employee rights in the federal sector. It cannot be doubted that Congress explicitly aimed to erect a comprehensive scheme from the patchworks of prior law: "the changes in law which are proposed in S.2640 [CSRA] will constitute the most comprehensive reform of the federal workforce since passage of the Pendleton Act in 1883." S.Rep. No. 969, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2723. Congress was painstakingly precise in its vision of the (pared-down) judicial role in CSRA cases. Thus,

> Currently employees who wish to challenge Commission decisions generally file their claims with U.S. District Courts. The large number of these courts has caused wide variations in the kinds of decisions which have been issued on the same or similar matters. The section remedies the problem by providing that Board decisions and orders ... be reviewable by the Court of Claims and U.S. Courts of Appeals, rather than by U.S. District Courts.

*Id.* at 2785.

Congress was sensitive to problems associated with decisional nonuniformity, *see id.* at 2784, and tailored a detailed and specific system crafted to minimize the risks of vagariousness. As part of the architecture of this design, the legislators abjured the federal district courts as a forum for employees such as the instant plaintiffs. No clearer case can be made for the time-honored canon of statutory interpretation, expressio unius est exclusio alterius.[5] The specific statement of one path for federal jurisdiction patently implies that other roads are blocked. Furthermore, the CSRA is so precise and delicately balanced that the engrafting of ancillary remedies upon the framework of the Act would inevitably create chaos within the federal sector, and sow the seeds of impermissible conflict. In fine, assertion of claims in a manner foreign to the CSRA paradigm, such as those which Tucker and Marx essay here, would loom as a formidable barrier to the speedy and efficacious accomplishment of the salutary objectives of the Civil Service Reform Act.

Such an interpretation is, moreover, virtually mandated by the Supreme Court's recent review of the CSRA in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). In *Bush,* the Court considered the contention of an aggrieved federal sector aerospace engineer that a federal district court could consider a cause of action for damages based on violations of first amendment rights perpetrated in the course of an allegedly retaliatory demotion. While CSRA does not literally bar a separate damage action, the Court was quick to distinguish *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) in the context of the federal workplace. Acknowledging the particularized and intricately detailed statutory grant of jurisdiction under CSRA, 462 U.S. at 380–89, 103 S.Ct. at 2412–17, 76 L.Ed.2d at 659–64, the Court stated,

> Given the history of the development of civil service remedies and the comprehensive nature of the remedies currently available, it is clear that the question we confront today is quite different from the typical remedial issue confronted by a common-law court. The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.

---

**4.** In addition, the FLRA itself also has certain powers to petition in the federal courts. 5 U.S.C. §§ 7123(b), (d). The FLRA has not done so in this case, nor have the plaintiffs sought properly to instigate such an initiative.

**5.** *See, e.g., Comtronics v. Puerto Rico Telephone Co.,* 553 F.2d 701, 707 (1st Cir.1977).

*Id.* at 389, 103 S.Ct. at 2417, 76 L.Ed.2d at 664.

*Bush,* of course, was a *Bivens* constitutional tort claim, and was characterized by the Court as such. It was not *stricto senso* a preemption case because it dealt with the *creation* of a new damages action. In the case sub judice, Tucker and Marx do not suggest that a neoteric cause of action be created; they merely asseverate that they are entitled to rely on already existing causes of action. And this, in their view, renders the *Bush* precedent inapposite. But, even if one assumes the validity of the plaintiffs' premise, such a distinction is of little, if any, importance.

Although *Bush* is doctrinally a *Bivens* case, the core dilemma of *Bush* is the tension between two grants of jurisdiction: 28 U.S.C. § 1331 (the general font of federal question jurisdiction) and the CSRA. Seen in that light, *Bush* is also a preemption case since the Court effectively held that the detailed remedial structure of CSRA "preempted" the less specific federal jurisdictional grant under § 1331.

In harmony with *Bush,* federal courts have uniformly noted the special nature of CSRA. In *Carter v. Kurzejeski,* 540 F.Supp. 396 (W.D.Mo.1982), *aff'd,* 706 F.2d 835 (8th Cir.1983), the plaintiff alleged tortious and unconstitutional interference with rights to freedom of expression in union activities. In dismissing the complaint, the district court held squarely that CSRA preempted any independent action. *Id.,* 540 F.Supp. at 398. And, Carter's attempt—reminiscent of a line of argument advanced here by Tucker and Marx—to distinguish his foray as a "constitutional grievance" was found to be "misplaced," the court noting that the claims, however garbed, were plainly ULPs within the exclusive ambit of the FLRA. *Id.* So, too, the Ninth Circuit, in *Veit v. Heckler,* 746 F.2d 508 (9th Cir.1984) opined that "the comprehensive remedial nature of the ... [CSRA] indicates a Congressional intent to preclude such judicial review except as provided for in the statute itself." *Id.* at 509.[6] *Cf. Schrachta v. Curtis,* 752 F.2d 1257, 1259–60 (7th Cir.1985) (per curiam).

The plaintiffs place considerable weight on *Karahalios v. Defense Language Institute Foreign Language Center Presidio of Monterey,* 544 F.Supp. 77 (N.D.Cal.1982), decided before *Bush* had sprung fullgrown from the collective brow of the Court, which held on facts analogous to those at bar that "[d]amages actions are a recognized exception to the rule that jurisdiction over labor disputes should be vested exclusively in a labor board in order to avoid conflicting regulation." *Id.* at 80. Yet, the case lacks persuasive precedential value for purposes of the suit at bar for at least three reasons. First, it is doubtful if *Karahalios* retains much (if any) vitality in the afterglow of *Bush.* The reasoning of the *Bush* Court is antithetic to the premise of *Karahalios* on the mainspring issues of congressional intent and outside interference.

Second, *Karahalios* runs counter to the heft of relevant authority. Some courts have stated that the CSRA provides a truly exclusive scheme of remedies and that the district courts have no role inasmuch as the statute confers no powers of review and

---

**6.** The encompassing nature of the CSRA renders the otherwise-respectable caselaw upon which the plaintiffs rely, *e.g., Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), inapplicable; there is no room in the CSRA stable for the *Vaca* steed. Congress' painstaking effort to design a complete remedial scheme must be construed, inter alia, to preempt any action founded on a breach of duty of fair representation. The fact that the abrogation of such a duty can be asserted as an ULP, *see id.* at 181, 87 S.Ct. at 912, leads inexorably, in federal sector matters, to the conclusion that CSRA should preempt separate actions in the district courts based on any such perceived breach. *See Martel v. Carroll,* 562 F.Supp. 443, 445 (D.Mass. 1983). The mandate of *Bush,* in conjunction with the unique interests sought to be vindicated in federal sector employment, make it clear that *Vaca* should be distinguished. This court has scant hesitancy in so holding. *See* text *post* at Part VII(1). The history and intent of the CSRA plainly prefigures that collateral district court jurisdiction would impede the ideals of fast, efficient management and greater uniformity in the judicial review process. *Vaca* is simply a horse of another color.

enforcement on them. *See, e.g., Yates v. United States Soldiers' and Airmen's Home,* 533 F.Supp. 461, 464 (D.D.C.1982) ("[T]he Act's enforcement scheme provides no avenue for intervention by district courts."). Other courts have specifically limited their holdings in light of the particular relief sought, so as to avoid the need for a more global construction of the statute. *See, e.g., National Federation of Federal Employees, Local 1263 v. Commandant, Defense Language Institute, West Coast Branch,* 493 F.Supp. 675, 681 (N.D.Cal.1980) (district court lacks jurisdiction to enjoin an unfair labor practice on petition of private party). But, either way, these courts have eschewed any judge-made rewriting of the CSRA and have treated the Act as an exclusive and comprehensive remedial scheme.[7] *Karahalios* goes against the grain of this respectable authority: the assertion of the *Karahalios* court that damage actions are somehow different contradicts *Yates* and undermines the rationale of cases like *Local 1263* (which, though limitable to their facts, nonetheless evidence the preemptive force of CSRA). And, *Karahalios* also clashes conceptually with the probationary employees' cases, *see* n. 7 *ante,* which painstakingly carve out an exception based upon the unique and insecure status of such workers under the CSRA.

Lastly, *Karahalios* is distinguishable. There, unlike the instant case, the plaintiff exhausted his administrative remedies by unsuccessfully seeking the issuance of a FLRA complaint. That point was pivotal in reaching the *Karahalios* result. *E.g.,* 544 F.Supp. at 81. To say, as do Tucker and Marx, that a damage action lies *at any time* in the administrative process goes far beyond *Karahalios* (which holds, at most, only that a damage action lies after FLRA proceedings have run the statutory course).

The plaintiffs' action against their employer is preempted by the "elaborate remedial system [of CSRA] that has been constructed step by step, with careful attention to conflicting policy considerations ...". *Bush,* 462 U.S. at 389, 103 S.Ct. at 2417, 76 L.Ed.2d at 664. The legislative branch of the national government has adequately evinced an intention to occupy the field of federal sector labor/management relations; and the assertion of supposed causes of action such as these plaintiffs espouse would unduly hamper the accomplishment and execution of the will of the Congress. The statutory and administrative mosaic is pervasive, and by its quintessential nature lends itself to uniformity which only insularity can confer. As the Seventh Circuit has recently pointed out in a somewhat analogous context, "[t]he CSRA ... is a detailed, comprehensive effort to regulate employee-management relations in the federal government." *Schrachta,* 752 F.2d at 1259. The Act holds sway in this instance, and this court lacks jurisdiction over the subject matter.

### 2. *Exhaustion of Remedies*

■ Though the CSRA appears to interdict the plaintiffs' case against DMA in all events, the court notes that even an application of the exotic balm of *Karahalios* would not save the day: it is obvious that the plaintiffs were required to exhaust appropriate administrative avenues before turning to this court for redress against their employer. They did not do so.

*Beverlin v. Internal Revenue Service,* 574 F.Supp. 553, 556 (W.D.Mo.1983); *cf. Dugan v. Ramsay,* 727 F.2d 192, 194–95 (1st Cir.1984) (applicants for employment). Though this phenomenon is worthy of note, it cuts little ice in the case at bar. And this court, while concluding that regular employees (such as Tucker and Marx) are barred from the pursuit of remedies alien to the CSRA scheme, has no occasion to pass upon the question of exclusivity vis-a-vis probationers.

---

7. Probationary employees have comprised a fairly well-recognized exception to this rule. Some courts, singling out the second-class CSRA status of probationary employees, have reacted by interpreting the Act narrowly as to them. In such straitened circumstances, Congress has been assumed not to have foreclosed probationers from collateral attack by means of a statute which arguably lacks a complete and integrated administrative process for such persons. *E.g., Borrell v. United States International Communications Agency,* 682 F.2d 981, 990 (D.C.Cir.1982);

As previously described, *see text ante* at Part IV, the Agreement contains a specific and sequential four tier grievance process, following the guidelines of 5 U.S.C. § 7121. The terms of the grievance procedure make it abundantly clear that an employee must mount each step before proceeding to the next. Steps three and four require the worker affirmatively to invoke Union assistance. Step four culminates in binding arbitration. *See* Agreement at Art. XXII. Arbitration is a well-regarded device in the field of labor/management relations, and it is a process from which exception is granted sparingly in federal sector matters. *See* 5 U.S.C. § 7122. There is, of course, a viable alternative: Article XXVI of the Agreement recognizes the right of an aggrieved employee to file ULP charges with the regional office of the FLRA. It is perfectly plain in this case that neither plaintiff adequately advantaged himself of any of the available remedies.

Given the summary judgment standard, *see* text *ante* at Part II, the court must assume for purposes of these motions that plaintiff Tucker complied fully with steps one and two of the grievance procedure. But, even if both DMA and Local 1884 were reticent—indeed, even if they violated the letter and/or spirit of the Agreement —, he was not without further administrative succor. If such recalcitrance amounted to a breach of the Agreement, Tucker could have made that very misconduct the topic of an ULP charge. *See* 5 U.S.C. § 7116. *See also* Agreement at Art. XXVI. Tucker was apparently aware of his rights in this regard, and did in fact so file. But, he gratuitously relinquished this initiative before the day of reckoning. Nor did he ever attempt to traverse the alternate course: there is nothing to indicate that he directly sought Local 1884's assistance in order to invoke his third (or fourth) step relief.

The court finds Marx, on this same point, to be in even more troubled waters. By his own account, once Trzyzewski told him that his complaint was "going nowhere," Marx proceeded no further. From and after the time that the change in policy was ex-

plained to him (as a byproduct of the informal DMA/Local 1884 meeting described above), he sat idly by. It would be an incredible feat of vaticination for Marx to contend that further administrative processing was inutile in his case, since he admits that he "indicated his acceptance of the Union's explanations" for the realignment and did not attempt to refile his grievance (or take any other action) after Trzyzewski allegedly redelivered the remonstrance to him. And, as with his co-plaintiff, Marx retained the right to file ULP charges with the FLRA and/or affirmatively to seek union assistance. He did neither.

Exhaustion doctrine requires substantially more from the plaintiffs than was exhibited here. In *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938), the Court laid down the cardinal rule that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." In the years since the prudential precept of *Myers* was first announced, it has been made manifest that "[exhaustion] doctrine requires *exhaustion*—not mere *invocation*—of administrative remedies before resort to the courts." *Andrade v. Lauer*, 729 F.2d 1475, 1486 n. 18 (D.C.Cir.1984) (emphasis original).

In *Andrade*, the District of Columbia Circuit carefully noted the exclusive nature of procedures for settlement of grievances under CSRA, 5 U.S.C. § 7121(a)(1), and the "sweeping provisions" defining "grievances" as any complaint "by any employee concerning any matter relating to the employment of the employee." 729 F.2d at 1486–87, quoting 5 U.S.C. § 7103(a)(9)(A). *See also Carter v. Kurzejeski*, 706 F.2d 835, 840 (8th Cir.1983) ("This procedural framework indicates the care taken by Congress to preserve the rights of aggrieved employees while avoiding the problems of overlapping and inconsistent jurisdiction."). The CSRA has consentiently been inter-

preted, with good reason,[8] to require complete exhaustion of its exclusive grievance procedures. *E.g., Keeffe v. Library of Congress,* 588 F.Supp. 778, 786–87 (D.D.C. 1984); *Schussel v. Weinberger,* 562 F.Supp. 819, 822 (D.Mass.1983). And, DMA has not in any way waived this exhaustion requirement. *Cf. Dugan,* 727 F.2d at 194.

It is here, then, that preemption and exhaustion meet. Even if *Karahalios* survives *Bush* —and this court thinks that it does not—, the most narrowminded reading of CSRA preemption would accord force and effect to the primacy of the statutory scheme at least until available administrative avenues have been fully explored. A comparison of the meagre efforts of Tucker and Marx with the painstaking travails of the *Karahalios* plaintiff in attempting to comply with CSRA makes the point with startling clarity. *E.g., Karahalios,* 534 F.Supp. at 1204. The instant plaintiffs did too little, too halfheartedly, to buttress a claim that their present action is a viable one.

■ Tucker and Marx assert, however, that there was no point in further pursuit of their perceived rights through administrative channels. To be sure, it is settled doctrine that an administrative remedy need not be invoked if it would be a futile or useless genture to do so. *McNeese v. Board of Education,* 373 U.S. 668, 674–76, 83 S.Ct. 1433, 1437–38, 10 L.Ed.2d 622 (1963); *City Farmers Trust Co. v. Schnader,* 291 U.S. 24, 34, 54 S.Ct. 259, 263, 78 L.Ed. 628 (1934); *Montana National Bank of Billings v. Yellowstone County,* 276 U.S. 499, 505, 48 S.Ct. 331, 333, 72 L.Ed. 673 (1928); *Baxter v. Claytor,* 652 F.2d 181, 185 (D.C.Cir.1981); *Sholly v. United States Nuclear Regulatory Commission,* 651 F.2d 780, 791 n. 28 (D.C.Cir.1980). *See* Davis, Administrative Law Treatise § 20.07 at 99 (1958). An essential element of the claim of futility, however, is that all reasonable possibilities of adequate adminis-

trative relief have been effectively foreclosed. *See, e.g., Wallace v. Lynn,* 507 F.2d 1186, 1190 (D.C.Cir.1974).

These plaintiffs have no basis for asserting that time honored exception to the exhaustion requirement. They were recalcitrant in numerous ways in processing their grievances, a circumstance from which they cannot now be allowed to profit. Perhaps more to the point, they nevertheless retained the option to pursue their claims through another administrative outlet. Assuming arguendo that Local 1884 and DMA had written in stone that they would not process the grievances in accordance with the Agreement, the plaintiffs still had the right to file ULPs with the FLRA (which itself would have been in a position to fashion an appropriate remedy). Tucker withdrew his ULP and Marx never filed one. Neither one has alleged so much as a hint of a suggestion that would lead this court, even for the minimal purposes of Rule 56 opposition, to credit the proposition that ULP proceedings would have been futile or useless. There is no reason to believe that the FLRA had a closed mind on the subject. And, even if the initiatives would likely have failed before the FLRA, such a prediction does not, in and of itself, establish futility or uselessness (though it may reflect upon the intrinsic merits of the claims). Thus, the plaintiffs have failed to meet an important precondition to a futility toehold, and cannot bootstrap themselves past the exhaustion hurdle on such a shoestring.

As to the defendant DMA, the plaintiffs have failed to exhaust—or even to tire slightly—the administrative remedies provided by CSRA and by the Agreement. Nor have they shown, by any objective criterion, that the cards were sufficiently stacked that their administrative quest was so foredoomed to failure as to render exhaustion an exercise in futility. Inasmuch

---

8. When Congress sets up a detailed administrative scheme, that scheme normally anticipates exhaustion of its procedures before resort to the courts. *See Shick v. Farmers Home Administration of the United States Department of Agricul-* *ture,* 748 F.2d 35, 39 (1st Cir.1984); *Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 774 (1st Cir.1981). There is no reason to exempt the CSRA from the usual rule.

as it is clear that, whatever view one takes of the preemptive effect vel non of CSRA's comprehensive remedial scheme, the administrative route must be travelled (or such travel excused), their actions against the employer are, in the present posture of the record, bootless.

## VII.  LIABILITY OF THE UNION.

Local 1884 arguably stands in a different set of shoes,[9] primarily because of the Court's decision in *Vaca v. Sipes, supra.* *Vaca* held that in private sector labor relations, federal statutory law does not preempt a separate action for damages based on the duty of fair representation even when such charges could form the basis of an ULP. *Id.* 386 U.S. at 183, 87 S.Ct. at 913. But *Vaca*, while undeniably good law in private sector cases, is not persuasive in precincts where the CSRA and the FLRA hold sway. And, even if a *Vaca* -type fair representation action would ordinarily lie in this case, it would be time barred.

### 1.  *The CSRA and the Duty of Fair Representation*

■ In *Martel v. Carroll, supra,* the district court considered almost the very same issue which is now before this court. In a thoroughgoing analysis of *Vaca* and the legislative history of the CSRA, Judge Zobel concluded that *Vaca* should be distinguished in the context of federal sector labor law. 562 F.Supp. at 444–45.[10] *Martel* relied on the strength of the overriding national concern in the federal sector labor

arena and on the express intent of Congress in enacting the CSRA. And, inasmuch as the balancing of interests is materially different in the federal sector, "where the public interest in an impartially administered but effective and efficient government predominates," *Martel,* 562 F.Supp. at 445, the *Martel* court held that a *Vaca* -type remedy was unnecessary, counterproductive, and ultimately, unavailable. The legislative history adequately evinces Congress's intent that the public interest stand paramount: "... the Committee has viewed civil service reform from the standpoint of the public, rather than the more limited perspective of either the employer or manager." S.Rep. No. 969, *supra,* 1978 U.S.Code Cong. & Ad.News at 2726.

No useful purpose would be served by repastinating the ground covered by *Martel.* It suffices to say that this court endorses both the result and the reasoning. In adopting the CSRA, Congress aimed at the creation of a fast, fair, and efficacious way in which to deal with management/personnel problems. Though the principal (specific) focus of the legislation may well, as the present plaintiffs contend, have been on the hiring/firing dichotomy, its reach was not so decurtate. Indeed, the claim fostered here by Tucker and Marx represents a classic illustration of the meddlesome and potentially disruptive effect which the allowance of an independent cause of action (especially one shorn of any meaningful exhaustion requirement) would pose.

---

9. It may well be that exactly the same preemption analysis heretofore explicated as to the putative liability of the employer, *see* text *ante* at Part VI(1), suffices to negate the prosecution of any similar claims against Local 1884. In one sense, at least, the slings and arrows aimed at DMA are inextricably intertwined with those aimed at the Union. *See, e.g.,* n. 11, *post.* And, many of the same considerations anent Congressional intent to occupy the field come into play. Since Tucker and Marx hypothesize, however, that the ramifications of their claims may differ dependent upon the identity of the particular defendant, the court, out of an abundance of caution, undertakes a separate perscrutation of the Union's liability.

10. In *Martel,* the plaintiff had exhausted administrative avenues and was essentially seeking

collterally to reverse the result by way of a breach of duty suit. In that regard, it was a stronger case for the claimant than the case at bar. Here, the plaintiffs have neglected to run the full administrative gauntlet. *See* text *ante* at Part VI(2). Even in the private sector, exhaustion is generally a prerequisite to the institution of a fair representation action. *See, e.g., DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983); *Hayes v. New England Millwork Distributors,* 602 F.2d 15, 18 (1st Cir.1979); *Soto Segarra v. Sealand Service,* 581 F.2d 291, 294–95 (1st Cir.1978); *DeArroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281, 283 (1st Cir.1970).

These plaintiffs seek to bypass both the grievance procedure and the FLRA, and to have a federal district court intervene to render what would perforce be a pronouncement on an interstitial interpretation anent a federal sector collective bargaining agreement. Such a matter falls much more appropriately within the congressionally mandated mechanism specially crafted to resolve such disputes. The questions which these claimants present, by their very nature, fit neatly within the integument of the FLRA's special competence and expertise. They can, as noted earlier, be brought before the agency as ULPs. *E.g.,* 5 U.S.C. § 7118. The lingering aftereffects of gratuitous judicial interference such as the plaintiffs attempt to incite would ineluctably impede critical management control in the public sector. This court, in line with other tribunals which have directly addressed the issue, holds that a duty of fair representation suit will not lie in the territory staked out by the CSRA. *See, e.g., Martel, supra; Warren v. American Federation of Government Employees Local 1759,* No. C83–2118A, slip op. at 1–2 (N.D.Ga. March 26, 1984); *Butler v. American Federation of Government Employees, Local 2089,* No. C–81–482, slip op. at 3 (N.D.Ohio Aug. 6, 1982).

### 2. *Time Constraints*

■ Even if an independent cause of action for breach of a union's obligation fairly to represent its members was not forestalled by the CSRA, the instant suit would nonetheless be time barred.

In *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court was called upon to determine the appropriate statute of limitations for an action brought by a union member against both his employer and his union. The Court held that, for litigation brought under the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* (NLRA), the federal courts must borrow and apply the six month statute of limitations governing the filing of unfair labor practice charges with

the National Labor Relations Board. *Id.* at 166–70, 103 S.Ct. at 2291–93. Although this holding is not squarely apposite to the case at bar because the CSRA (rather than the NLRA) governs federal sector employees, the tenets underlying the Court's decision in *DelCostello* are transferable.

What was said by this court, in holding that the *DelCostello* rule applied with undiminished vigor to fair representation suits under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.,* is equally apposite in the circumstances at bar:

> [T]he balance of interests so painstakingly crafted by the Court in *DelCostello* —the search for equipoise between the national interest in stability of bargaining and in the expeditious and certain resolution of labor disputes, on the one hand, and the similar but more particularized interest of all parties to a given dispute (employer, employee and union) in not only those considerations but in individualized rights and in the availability of judicial review designed to insure fairness of results without undue disruption of the workplace, the collective bargaining process or the protectable rights of the parties themselves, on the other hand—is precisely what is at stake here. To borrow a phrase utilized by the Supreme Court in a somewhat divergent context, "the family resemblance is undeniable."

*Linder v. Berge,* 567 F.Supp. 913, 916 (D.R. I.1983), *aff'd,* 739 F.2d 686 (1st Cir.1984) (quoting *DelCostello,* 462 U.S. at 170, 103 S.Ct. at 2293).

Indeed, the rationale for insisting upon the imposition of a uniform federal statute of limitations (as opposed to a hodgepodge of varying state time limits) is much stronger in the case of government employees. The very reasons which distinguish this case from *Vaca, see* text *ante* at Part VII(1), make it highly advisable to apply the *DelCostello* rule in the instant action. The federal interest is at its zenith in the environs of the CSRA. Here, where the charges could and should have brought in the guise of ULP filings, it makes abun-

dant sense to borrow that statute of limitations applicable to ULPs, namely, the six month limitations period specifically provided in 5 U.S.C. § 7118(a)(4)(A). Congress sought to have federal sector personnel decisions handled quickly and efficiently; utilization of a lengthier state statute of limitations would risk putting management decisions in a litigation limbo for years, and would kaleidoscopically vary the rights of federal sector workers depending upon the locus of the facility to which they were assigned.

In this case, the plaintiffs contend that the Union, through Trzyzewski, Zambaranno, and Charlebois, neglected to assist them in May, 1983. The temporary shift in duty hours was rescinded in October of 1983. If there was no requirement to exhaust administrative remedies, then the six month limitations period would have run long before this suit was filed on July 28, 1984. And, if such a requirement did exist, the plaintiffs have defaulted on it. *See* text *ante* at Part VI(2). Either way, Tucker and Marx seem hoist by their own petard.

The fact that Tucker withdrew his ULP from the regional office on January 25, 1984 does not save his claim. This is not a suit against the FLRA, nor a review of a final agency order. The operative facts all occurred no later than October, 1983. The rule of *Santos v. District Council of New York City and Vicinity of United Brotherhood of Carpenters and Joiners of America, AFL–CIO*, 619 F.2d 963, 969 (2d Cir.1980), to the effect that a cause of action for breach of duty of fair representation accrues "no later than the time when plaintiffs knew or reasonably should have known that such a breach had occurred

even if some possibility of nonjudicial enforcement remained," should apply here. The fact that Tucker initiated a proceeding which he saw fit to discontinue should not afford him the benefit of tolling. Allowing such a tactic would give a plaintiff a degree of control over the timing of litigation which would seriously jeopardize the mandate to achieve fast, fair, and efficient employee grievance resolutions under CSRA. *Cf. Bush*, 462 U.S. at 384–86, 103 S.Ct. at 2414–15, 76 L.Ed.2d at 661–62. That, in turn, would violate the *DelCostello* maxim that the choice of a limitations period should "accommodate [the] balance of interests" of the relevant statute. 462 U.S. at 169, 103 S.Ct. at 2293. And, from the birth of the *DelCostello* rule, courts which have considered the issue of tolling for pending administrative proceedings have echoed that sentiment. *See, e.g., Association of Frigidaire Model Makers v. General Motors Corp.*, 573 F.Supp. 236, 239 (S.D. Ohio 1983) ("[A]ny tolling under federal law must be comparable with the Congressional purpose behind the federal statute governing liability.").

To the extent that the plaintiffs possessed judicially actionable claims at all, those causes of action accrued no later than the fall of 1983. By that time, Tucker and Marx undeniably knew the totality of the underlying facts, not only anent the shift in duty hours itself, but also as to the Union's attitude. Yet, they slept upon their perceived rights until well past the expiration of the limitations period. That somnolence robs the instant claims against the Union of any present vitality.[11]

## VIII. CONCLUSION.

The mountain has labored long and hard, but it has brought forward only the puniest

---

**11.** Indeed, to the extent that the statute of limitations is a bar, it would also preclude the plaintiffs' case against DMA. The claims against the union and the employer are in this instance "inextricably interdependent." *See DelCostello*, 462 U.S. at 164–65, 103 S.Ct. at 2290–91, quoting *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 66, 101 S.Ct. 1559, 1565, 67 L.Ed.2d 732 (Stewart, J., concurring). Thus, the case must be viewed as a hybrid breach of

contract/breach of fair representation claim, squarely within the *DelCostello* rubric. *See Scaglione v. Communications Workers of America, Local 1395*, 759 F.2d 201, 202 (1st Cir. 1985) (per curiam). *Cf. Linder v. Berge*, 577 F.Supp. 279, 281–82 (D.R.I.1983), *aff'd*, 739 F.2d 686, 688–89 (1st Cir.1984) (Railway Labor Act). The symbiosis and need for consistency seem especially compelling vis-a-vis employment in the federal sector.

of mice. When the orogeny which pervades the plaintiffs' amended complaint is shorn of its rhetorical trappings, the little that remains cannot withstand the rigors of the defendants' summary judgment initiatives. Tucker and Marx, to the extent (if at all) that they have been aggrieved by the temporary shift in duty hours, have attempted to scale the wrong peak, in the wrong sequence, and at the wrong time. Their joint tirade is no less than thrice barred: by the primacy of the CSRA, by their failure to exhaust available administrative remedies, and by the passage of time.

The record is barren of any *genuine* issue of *material* fact. The defendants' motions for *brevis* disposition in their favor must be, and each hereby is, granted.

*So ordered.*