**Paul E. MONTPLAISIR, et al.,
Plaintiffs, Appellants,**

v.

**Richard J. LEIGHTON, et al.,
Defendants, Appellees.**

No. 88–1979.

United States Court of Appeals,
First Circuit.

Heard Feb. 6, 1989.

Decided May 11, 1989.

Jean–Claude Sakellarios, Manchester, N.H., for plaintiffs, appellants.

Richard C. Nelson with whom Arnold H. Huftalen and Devine, Millimet, Stahl & Branch Professional Ass'n, Manchester, N.H., were on brief, for defendants, appellees.

Before SELYA, Circuit Judge,
ALDRICH and COFFIN, Senior Circuit
Judges.

SELYA, Circuit Judge.

With apologies to the poet,[1] this case is "here as on a darkling plain swept with confused alarms of struggle and flight." But the darkness is more apparent than real: by ignoring the grating roar of partisan rhetoric and concentrating instead on what Congress purposed and what the Court has taught, ample illumination is to be found. In the light of reason and precedent, the district court's dismissal of the action was proper.

## I. STATEMENT OF THE CASE

In 1981, appellants Paul Montplaisir, Richard Nemi, Roger Wilson, and Robert O'Connell were employed as air traffic controllers (ATCs) at a Federal Aviation Administration (FAA) facility in Nashua, New Hampshire. The Professional Air Traffic Controllers Organization (PATCO), a union to which the four belonged, was the exclusive bargaining representative for all ATCs in the FAA's employ. PATCO struck—illegally—on August 3, 1981. President Reagan called the strikers' bluff and ordered the dismissal of those who, like appellants, refused to return to work immediately. Consequently, appellants were cashiered.

Casting about for remediation, appellants invoked diversity jurisdiction, 28 U.S.C. § 1332(a), and brought suit in the United States District Court for the District of New Hampshire against attorney Richard J. Leighton and Leighton, Conklin, Lemov, Jacobs, & Buckley, a law firm. They alleged that defendants, who served in 1981 as PATCO's general counsel, encouraged the unlawful strike and negligently advised

---

1. M. Arnold, *Dover Beach*, st. 4 (1867).

union members (plaintiffs included) that they ran no significant risk of losing their jobs by participating in the walkout. Plaintiffs claim to have heeded this advice, with the dire consequences already related. None of them, however, had an individual attorney-client relationship with defendants at any time pertinent to this appeal. Rather, defendants were retained by, and acted on behalf of, PATCO while conducting the pre-strike counseling at which this litigation is aimed.

Plaintiffs describe their multicount complaint[2] as follows:

> All four Plaintiffs allege that the Defendants, by their actions in encouraging participation in the 1981 PATCO strike and in failing to properly advise Plaintiffs prior to, during and immediately after the strike, breached their contract and breached their duty to Plaintiffs (Counts I and II); negligently, intentionally and fraudulently made false representations (Counts III, IV, VI); and failed to disclose or otherwise appropriately respond to clear conflicts of interest between PATCO, as an organization, and individual PATCO members, including Plaintiffs (Counts VIII and X).

Appellants' Brief at 4. Defendants moved to dismiss. Fed.R.Civ.P. 12(b)(1), (6). Believing that it lacked subject matter jurisdiction, the district court granted the motion. This appeal followed.

## II. DISCUSSION

The complaint's various statements of claim are largely window dressing: as appellants candidly concede, "[t]his is a legal malpractice action...." Appellants' Brief at 2. Therefore, the inquiry becomes: can the district courts exercise diversity jurisdiction over state-law malpractice claims brought by public employees against their union's lawyers, when the alleged malpractice occurred within the ambit of the collective bargaining process? For the answer, we look to the governance of the federal workplace and to the rights and responsibilities of public-sector unions and employees. In so doing, we find that two federal labor-law doctrines converge to bar the action.

### A. *Exclusivity of CSRA.*

While plaintiffs base their suit on a state cause of action, we cannot ignore the panoramic federal scheme for regulating federal employee relations. We view Congress' deliberate consignment to an independent board, the Federal Labor Relations Authority (FLRA), of claims arising under the federal-sector labor statute as relevant to, though not necessarily controlling, the determination whether Congress intended to preempt state-law malpractice claims under the circumstances of this case. The pertinent federal enactment, Title VII of the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 7101 *et seq.*, is an important component of the legislation which "comprehensively overhauled" the federal civil service. *Lindahl v. OPM*, 470 U.S. 768, 773, 105 S.Ct. 1620, 1624, 84 L.Ed.2d 674 (1985). Title VII allowed collective bargaining in the public sector and provided detailed methodologies for dispute resolution. *See, e.g.,* 5 U.S.C. §§ 7116(d), 7121, 7122. The statute created the FLRA and vested it with responsibility for, *inter alia*, supervising the collective bargaining process, promulgating administrative rules for federal labor relations, and adjudicating disputes over such matters as negotiability, bargaining units, arbitration, and representation elections. *See* 5 U.S.C. §§ 7104, 7105(a)(1), 7105(a)(2)(A)–(I); *see also Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 92–93, 104 S.Ct. 439, 441–42, 78 L.Ed.2d 195 (1983). In short, CSRA contains within its four corners "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations." *Bush v. Lucas*, 462 U.S. 367, 388, 103 S.Ct. 2404, 2417, 76 L.Ed.2d 648 (1983).

Under the rules of that system, judicial oversight is "both prescribed and proscribed," *Tucker v. Defense Mapping*

---

**2.** Counts V, VII, and IX dealt with other matters. Judgment thereon was entered in defendants' favor on August 10, 1988. There has been no appeal from that judgment. For simplicity's sake, we treat the complaint as if these counts had not been included.

*Agency,* 607 F.Supp. 1232, 1238 (D.R.I. 1985), and the district courts are largely omitted from the equation. *Id.* at 1238–39. Specifically, Title VII limits the federal judiciary's role to three instances: an aggrieved party may request review of "final" FLRA orders in the courts of appeals; the FLRA may petition a court of appeals for enforcement of its orders; and the FLRA may seek an injunction in district court after issuing a complaint. 5 U.S.C. § 7123; *see also Karahalios v. National Federation of Federal Employees, Local 1263,* —— U.S. ——, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989); *Columbia Power Trades Council v. United States Dept. of Energy,* 671 F.2d 325, 327 (9th Cir.1982).

Because Congress constructed an "integrated scheme of administrative and judicial review," *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 672, 98 L.Ed.2d 830 (1988), the Court—mindful that private rights of action should not be allowed free rein where there is a realistic threat of interference with the federal regulatory scheme—has jealously guarded CSRA against inconcinnous judicial incursions. For example, the Court has held that CSRA's "comprehensive system for reviewing personnel action taken against federal employees" bars a federal worker from suing for backpay on the ground that he was wrongly suspended. *Fausto,* 108 S.Ct. at 677. By the same token, the statute's "elaborate, comprehensive scheme ... by which improper action may be redressed" prohibits a federal employee from bringing a damages action against his superior premised on alleged abridgment of first amendment rights in the workplace. *Bush,* 462 U.S. at 385–90, 103 S.Ct. at 2414–18. The circuits have been equally as forthcoming; in a variety of settings, they have followed the Court's lead and treated CSRA as establishing the sole mechanism for resolving labor conflicts in the federal arena. *See, e.g., Spagnola v. Mathis,* 859 F.2d 223, 228–29 (D.C.Cir.1988) (CSRA precludes *Bivens* action premised on conduct amounting to prohibited personnel practice); *Warren v. Local 1759, American Federation of Government Employees,* 764 F.2d 1395, 1399 (11th Cir.) (FLRA pos-

sesses exclusive jurisdiction over federal employee's unfair representation claim), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985); *Columbia Power Trades,* 671 F.2d at 327 (FLRA has "exclusive jurisdiction over federal labor relations matters").

Most recently, the Supreme Court has ruled that district courts cannot entertain a federal employee's damages action against his union for an ostensible breach of the union's duty of fair representation. *Karahalios,* 109 S.Ct. at 1287. The Court refused to imply a private cause of action from CSRA's fair representation provision, 5 U.S.C. § 7114(a)(1), reasoning that such suits "would seriously undermine what we deem to be the congressional scheme, namely to leave the enforcement of union and agency duties under the Act to ... the FLRA and to confine the courts to the role given them under the Act." *Karahalios,* 109 S.Ct. at 1288. *Karahalios,* it would seem, is an ominous portent for the present plaintiffs: they could not have sued PATCO in federal court for the poor advice they received; that would have been a "fair representation" claim, and barred. It would, therefore, be incongruous to allow pursuit of those very claims against those who implemented the union's course of action.

The same result obtains once it is recognized that the complaint's allegations amount *au fond* to unfair labor practice charges. *Compare* 5 U.S.C. § 7116(b) ("it shall be an unfair labor practice for a labor organization.... (7)(A) to call, or participate in, a strike, work stoppage, or slowdown ... or (B) to condone any [such] activity ... by failing to take action to prevent or stop [it]"). Congress meant to vest the FLRA with "exclusive and final authority to issue unfair labor practice complaints," limiting opportunities for judicial review to those delineated in 5 U.S.C. § 7123. *Karahalios,* 109 S.Ct. at 1287 (citing legislative history); *Clark v. Mark,* 590 F.Supp. 1, 8 (N.D.N.Y.1980) (claims which "are arguable unfair labor practices ... must be dismissed as pre-empted under [CSRA].");  *cf. San Diego Building Trades*

*Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959) (when "activities which a State purports to regulate ... constitute an unfair labor practice under [the NLRA], due regard for the federal enactment requires that state jurisdiction must yield"). That appellants chose not to couch their complaint as an unfair labor practice cuts no mustard. Where labor-law preemption is an issue, creative labelling cannot carry the day. Rather, the needed reconnaissance focuses upon "the conduct being regulated, not the formal description of governing legal standards...." *Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 292, 91 S.Ct. 1909, 1920, 29 L.Ed.2d 473 (1971); *see also Columbia Power Trades*, 671 F.2d at 329 (FLRA's exclusive jurisdiction cannot be thwarted by party's characterization of lawsuit).

### B. *The Lawyers' Liability.*

Since plaintiffs cannot bypass the provisions of CSRA and sue the union directly in district court, our inquiry reduces to whether they can sue the lawyers. Because the latter were engaged by and working for the union when they offered the challenged advice, we think them immune to suit. It would be equally as disruptive to permit plaintiffs to accomplish indirectly (by suing PATCO's lawyers) what *Karahalios* bars them from accomplishing directly (by suing PATCO).

■ The Court has long held that "union agents" are not personally liable to third parties for acts performed on the union's behalf in the collective bargaining process. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 247–49, 82 S.Ct. 1318, 1324–25, 8 L.Ed.2d 462 (1962). This immunity obtains "in contract or tort, or both, ... or in a separate action for damages." *Id.* at 249, 82 S.Ct. at 1325. More recently, the Court widened the embrace of *Atkinson*, ruling that damages immunity remained in effect even if the union had not authorized the actor's conduct. *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 417, 101 S.Ct. 1836, 1845–46, 68 L.Ed.2d 248 (1981).

The policy which undergirds the *Atkinson* rule is straightforward. Congress was deeply concerned by the use of private lawsuits against workers as a "union-busting" device.[3] Consequently, in section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, Congress "declared its view that only the union was to be made to respond for union wrongs, and that the union members were not to be subject to levy." *Atkinson*, 370 U.S. at 247–48, 82 S.Ct. at 1324. With monotonous regularity, court after court has cited *Atkinson* to foreclose state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process. *See, e.g., Peterson v. Kennedy*, 771 F.2d 1244, 1256–57 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986); *Universal Communications Corp. v. Burns*, 449 F.2d 691, 693–94 (5th Cir.1971) (per curiam); *Suwanchai v. Int'l Bhd. of Electrical Workers*, 528 F.Supp. 851, 861–62 (D.N.H.1981). This principle has become so embedded in our jurisprudence that it brooks no serious challenge.

Faced with such a powerful line of authority, appellants concentrate most of their energies on a multifaceted claim that *Atkinson* is inapposite to the facts and circumstances at bar. They offer a handful of reasons, four of which merit decurtate discussion.

1. *The CSRA Difference.* Appellants point out, correctly, that *Atkinson* and its progeny were private-sector cases not involving government employees. That distinction, while true, cuts against appellants' position. Fair representation claims by private-sector employees are cognizable in federal district court because Congress,

---

3. That tactic had received Supreme Court sanction in the so-called *Danbury Hatters* case, *Lawlor v. Loewe*, 235 U.S. 522, 534–35, 35 S.Ct. 170, 171–72, 59 L.Ed. 341 (1915) (boycotted manufacturer could recover damages in Sherman Act suit against individual union members); *Loewe v. Lawlor*, 208 U.S. 274, 294–97, 28 S.Ct. 301, 303–05, 52 L.Ed. 488 (1908) (similar). *See Atkinson*, 370 U.S. at 248, 82 S.Ct. at 1324–25.

when it passed the labor statute giving rise to the duty, had not yet granted the National Labor Relations Board jurisdiction over unfair labor practice claims. *See Vaca v. Sipes*, 386 U.S. 171, 181–82, 87 S.Ct. 903, 912–13, 17 L.Ed.2d 842 (1967) (union member can maintain suit under 29 U.S.C. § 185 for breach of duty of fair representation). In the federal employee arena, on the other hand, the statute originally establishing the FLRA and granting it exclusive jurisdiction over unfair labor practice claims not only established the duty of fair representation but also simultaneously constituted breach thereof as an unfair labor practice. *Karahalios*, 109 S.Ct. at 1287–88. Consequently, district courts cannot entertain federal employees' fair representation suits. *Id.*

Inasmuch as Congress decided that a public-sector union cannot itself be sued for unfair labor practices, it would defy logic to allow disgruntled union members to accomplish much the same result by circumnavigation. *Compare Atkinson*, 370 U.S. at 249, 82 S.Ct. at 1325 (national labor policy "cannot be evaded or truncated by the simple device of suing union agents"). To preserve the integrity of CSRA's statutory scheme, the *Atkinson* rule must fully apply in the public sector. The "CSRA difference" hawked by plaintiffs is a difference bereft of a meaningful distinction.

2. *Absence of Damages Remedy.* In a variation on the "CSRA difference" theme, plaintiffs complain that pretermitting their suit leaves them without any damages remedy. That may well be so. As we understand the statute, Congress intended (1) to shield unions from tort (or similar) liability for acts related to the collective bargaining process, and (2) to resolve complaints against unions through an administrative process. That injured employees might be left without a means of recovering money damages is a necessary consequence of the construct. Congress, in its wisdom, was fully entitled to prefer administrative enforcement to civil trials.[4] *Cf. Lane v. First Nat'l Bank*, 871 F.2d 166, 173–74 (1st Cir. 1989) (in Copyright Act of 1976, Congress fashioned a right for which it ceded no corresponding damages anodyne against certain infringers; court will not imply one). As Justice Stevens has written in a kindred case:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy.... That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff. The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy....

*Bush*, 462 U.S. at 388, 103 S.Ct. at 2416–17. Performing the requisite analysis in this case leads to the inescapable conclusion that Congress intended to preempt state-law tort actions.[5]

3. *Lawyers Are A Breed Apart.* Appellants claim that attorneys should not be considered "union agents" within the

---

4. We are singularly unimpressed by the notion that, since PATCO has been dissolved, appellants should be permitted to sue PATCO's attorneys because approaching the FLRA would be pointless. On this record, it cannot be said that CSRA's mechanisms for redress are, in themselves, "absolutely futile," *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 331, 89 S.Ct. 548, 552, 21 L.Ed.2d 519 (1969). In any event, plaintiffs are largely responsible for their own predicament, since they were able to commence administrative action against the union when doing so might have been a more viable alternative, but did not. *See generally* 5 U.S.C. § 7118(a)(4)(A) (unfair labor practice charges must ordinarily be filed with FLRA within six months of date of occurrence).

5. We abjure a detailed discussion at this point, as our expository efforts could add little to what the Court has said in *Karahalios*, 109 S.Ct. at 1286–88, *Fausto*, 108 S.Ct. at 671–75, and *Bush*, 462 U.S. at 385–90, 103 S.Ct. at 2414–18. These decisions, we think, establish beyond peradventure that the disruptive effects of judicially-created, newly-implied rights of action upon CSRA's statutory scheme would far outweigh any concomitant benefits.

sweep of *Atkinson*. Yet, the single pertinent authority points in precisely the opposite direction. In *Peterson*, plaintiff sued union attorneys who, he claimed, had furnished inaccurate advice upon which he relied in pursuing a grievance against his ex-employer. 771 F.2d at 1251. The panel concluded that "attorneys who perform services for and on behalf of a union may not be held liable in malpractice to individual grievants where the services the attorneys perform constitute a part of the collective bargaining process." *Id.* at 1256.

This result seems eminently reasonable. The appropriate test for *Atkinson* immunity ought not to be the actor's identity, occupation, or formal position, but rather, the role that he played. As the Ninth Circuit explained, one must essay a "functional assessment." *Peterson,* 771 F.2d at 1259. It is not much in doubt that, ordinarily, an attorney is the client's "agent" within the traditional legal import of that term. *See, e.g., Prate v. Freedman,* 583 F.2d 42, 48 (2d Cir.1978) (in American legal system, "an attorney is his client's agent and representative"); *Ampex Credit Corp. v. Bateman,* 554 F.2d 750, 753 (5th Cir. 1977) ("[a]t the very least, a lawyer has the authority of any other agent"); *cf. LeBlanc v. INS,* 715 F.2d 685, 694 (1st Cir. 1983) (litigants are customarily bound by their lawyers' conduct). A union-retained attorney conducting strike-related business falls unarguably within that encincture. As in *Peterson,* the lawyer acts as "an arm of [the] union." 771 F.2d at 1258. Where counsel has been delegated "a function that often is performed by a union's business agents or representatives," *id.* at 1258, disregarding the *Atkinson* rule "is not warranted or permissible merely because a union chooses to employ an attorney." *Id.* at 1259. Doctrinally, *Atkinson* fits this situation like a well-worn glove.

Furthermore, there are strong policy considerations which favor extending *Atkinson* to lawyers. In the first place, permitting malpractice suits whenever a union's legal strategies fail would inevitably impede the speedy processing and determination of industrial disputes. State statutes of limitations for legal malpractice are typically far more generous [6] than the six-month deadline for prosecuting unfair labor practice charges under CSRA, 5 U.S.C. § 7118(a)(4), or the National Labor Relations Act (NLRA), 29 U.S.C. § 160(b), or for bringing a hybrid action against both union and employer, *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 169, 103 S.Ct. 2281, 2293, 76 L.Ed. 2d 476 (1983). As the Court pointed out in *DelCostello,* "application of a ... [three-year] malpractice statute ... would preclude the relatively rapid final resolution of labor disputes favored by federal law." *Id.* at 168, 103 S.Ct. at 2292. Appellants' approach, we fear, would likely resurrect workplace grievances long buried, transferring the battles to a tort arena and in the bargain upsetting delicate equilibria which federal law seeks to sustain. "A long period of controversy and conflict can be a serious burden, both for the grievant and for the management, and can poison the relationship between the contracting parties that the contract was designed to establish and preserve." *Communications Workers of America v. Western Electric Co.,* 860 F.2d 1137, 1142 (1st Cir.1988) (quoting *Teamsters Union Local 315 v. Great Western Chemical Co.,* 781 F.2d 764, 766 (9th Cir.1986)).

Then, too, the negligence test employed in state-law malpractice actions differs materially from the federal-law test for unfair representation. Under the latter, plaintiffs must prove that a union's conduct was "arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916; *see also National Treasury Employees Union v. FLRA,* 800 F.2d 1165, 1171 (D.C.Cir. 1986) (Congress in CSRA "adopted for government employee unions the private sector duty of fair representation"). Allowing the action proposed here would create an anomalous situation in which certain union agents would be held to a far higher

---

**6.** For example, at the time appellants' claims accrued, New Hampshire's statute of limitations for legal malpractice was six years. The statute was amended in 1986 to set a three-year deadline for all causes of action arising on or after July 1, 1986. *See* N.H.Rev.Stat.Ann. § 508:4(I).

standard of care than the union itself. Such an outcome makes precious little sense.

Finally, the original concerns which led to development of the *Atkinson* rule remain salient here. Were disaffected union members allowed to sue the union's legal advisers,

> the union attorney would often be the only defendant against whom a disappointed grievant could proceed. He would become the natural, and only, target in large numbers of what would normally be ... fair representation suits.

*Peterson,* 771 F.2d at 1259–60. Attorneys would be at risk for strike-related damages which in fact flowed from the union's political or tactical choices. This could, in turn, severely hamper unions in enlisting qualified representatives. By requiring that employees dissatisfied with union conduct proceed against the union alone (if at all), the *Atkinson* rule removes precisely this sort of threat to the collective bargaining process.[7]

In fine, lawyers may be a breed apart— but for purposes of the *Atkinson* principle, they must be treated the same as other union agents.

4. *Scope of "Collective Bargaining Process".* CSRA's definitions of "employee," 5 U.S.C. § 7103(a)(2)(B)(v), and "labor organization," 5 U.S.C. § 7103(a)(4)(D), exclude participants in a strike. Relying upon this language, appellants propound the following syllogism: (1) the federal collective bargaining process does not countenance strikes; (2) defendants met with union members solely to encourage and ensure that a strike would take place; therefore, (3) defendants' actions were "wholly unrelated" to the collective bargaining process. We think the argument brazen—the pot can scarcely call the kettle black.

That the ATCs' strike was illegal did not make it any less a collective bargaining

activity. The measure was designed to put coercive pressure on management and secure the union's bargaining objectives. The strike climaxed a core dispute that "gr[ew] out of the collective bargaining relationship," *National Treasury Employees,* 800 F.2d at 1170. No more was necessary to invoke the prophylaxis of the *Atkinson* principle.

We find controlling authority in *Reis.* The Court there held union members harmless from suit over a wildcat strike that violated the collective bargaining agreement and had not been authorized by the union. 451 U.S. at 415–16, 101 S.Ct. at 1844–45. The *Reis* Court left no doubt as to its rationale:

> Congress deliberately chose to allow a damages remedy for breach of the no-strike provision of a collective bargaining agreement only against *unions,* not *individuals,* and, as to unions, only when they participated in or authorized the strike.

*Id.* at 416, 101 S.Ct. at 1845. (emphasis in original). In our view, *Reis* ends the matter, foreclosing the argument that *Atkinson* protection vanishes if illegal tactics are employed in a labor dispute.

Before leaving this subject, we add an eschatocol of sorts. Ex–ATCs, such as plaintiffs, stand in a singularly poor position to assert a right of recovery against lawyer-defendants for counseling the commission of an unlawful act. It was plaintiffs' union which masterminded the strike effort. *See PATCO v. FLRA,* 685 F.2d 547, 575–86 (D.C.Cir.1982) (reviewing evidence of PATCO's backing for strike). It was no secret that strikes against the federal government were illegal, *see, e.g.,* 5 U.S.C. § 3333(a) (federal employees must execute affidavits attesting that they will not strike against the government), and these suitors admitted in their complaint that they knew a work stoppage would be

---

7. Plaintiffs try to distinguish *Peterson* because it involved "staff attorneys" for unions as opposed to private counsel (as here). The same point was raised in the *Peterson* concurrence. *See Peterson,* 771 F.2d at 1264 (Wiggins, J., concurring). But, the policy considerations which underbrace *Atkinson* do not support such a line of demarcation. Counsel, whether "outside" or "inside," should be protected by the *Atkinson* rule so long as they perform work for the union within the collective bargaining context. *Accord Peterson,* 771 F.2d at 1258.

unlawful. The "bad advice" which the attorneys reportedly gave was that plaintiffs would probably incur no penalty for violating the statute because "there is no way that the government can ... fire 15,000 air traffic controllers...." Appellants' Brief at 14. Thus assured that they could act with impunity, the ATCs, plaintiffs included, proceeded to flout the law. Having been caught in toils of their own construction, plaintiffs have little basis for asking us to poke a hole in CSRA's regulatory net for their aid and succor.

## III. CONCLUSION

 CSRA is the beacon by which we must steer. Given the comprehensive nature of the Act's remedial scheme and the disruption which private tort actions would cause to its finespun fabric, we think it readily evident that Congress did not intend—and we should not allow—supplementary judicial remedies of the sort envisioned by appellants. And in the afterglow of *Karahalios*, any lingering doubts dissolve. Mindful of the anomaly which would result from denying members the right to sue the union for deficient representation, but allowing them to sue union agents for precisely the same conduct, we rule that the *Atkinson* principle extends to federal-sector employment. That being the case, CSRA necessarily precludes the maintenance of state-law malpractice claims against lawyers acting as the union's emissaries in the collective bargaining process.[8]

We need go no further. Darkling plain notwithstanding, the necessary coruscation emerged. The district court clearly visualized the situation and correctly grounded the suit.

*Affirmed.*

---

**8.** Contrary to plaintiffs' jeremiad, our decision today by no means entirely insulates labor attorneys against malpractice suits. The union itself may, consistent with *Atkinson,* sue a retained attorney and use the recovery to compensate union members for damages sustained. *Peterson,* 771 F.2d at 1259. Second, *Atkinson* applies only to lawyers acting in the union's behalf; members are not barred from suing lawyers

BAILEY ALDRICH, Senior Circuit Judge, concurring.

The court's legal analysis and reasoning seems impeccable, and I agree with it, but feel, in this particular case, that its final point should be first. The bare fact is that the union, and plaintiffs as assenting members, knowingly determined to embark on an illegal enterprise, and employed defendants to advise how, to put it bluntly, they could best get away with it. Now they wish to be paid because the operation failed. Cutting away the trappings and formalistic rationalizing, can a bank robber who is apprehended sue the driver of the getaway car? Naturally defendants do not defend by saying that their advice was, in itself, unlawful, but even if defendants fell short of being aiders and abettors, plaintiffs are in no position to seek judicial assistance. I am surprised that they should expect it.

---

whom they have hired. *See, e.g., Weitzel v. Oil Chemical & Atomic Workers,* 667 F.2d 785, 786–87 (9th Cir.1982) (union member sued private law firm to which union had referred him). Third, *Atkinson* does not shield legal services unrelated to the collective bargaining process (*e.g.* wills, divorces, personal injury suits), even if handled by union counsel. *Peterson,* 771 F.2d at 1259.