Hiram ALICEA, et al.,
Plaintiffs, Appellants,

v.

SUFFIELD POULTRY, INC., d/b/a
Royal Harvest Foods, et al.,
Defendants, Appellees.

No. 89–1521.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1989.

Decided April 25, 1990.

Dina E. Fein, Springfield, Mass., for plaintiffs, appellants.

David B. Rome, Boston, Mass., for defendants, appellees.

Before TORRUELLA and SELYA, Circuit Judges, and COFFIN, Senior Circuit Judge.

COFFIN, Senior Circuit Judge.

Thirteen past and present employees of a Massachusetts chicken processing company claim that their union breached its duty of fair representation when the union's business agent misrepresented the consequences of an unauthorized work stoppage, inducing them to strike and causing their discharge. The district court granted summary judgment for the union, finding that the business agent's alleged conduct did not rise to the level of a fair representation violation. 711 F.Supp. 48. After a careful review of the record and the caselaw, we affirm in part, reverse in part and remand.

I.

Plaintiffs are present or former employees of Royal Harvest Foods, a chicken processing plant in Springfield, Massachusetts.[1] They were employed in two departments at Royal Harvest: seven worked in the deboning department and were paid by the pound for their work in removing bones from slaughtered chicken (the "deboners"), and six worked in the packing department and were paid at an hourly rate (the "packers" or "hourly workers").[2] The workers were represented by the United Food & Commercial Workers Union, which had been recognized voluntarily by the company in the spring of 1983 and had negotiated a collective bargaining agreement that went into effect August 1 of that year.

Plaintiffs' difficulties with Royal Harvest began in late 1984, when the company began to force the deboners to work beyond their normal hours without paying overtime. The plant manager, Dennis Meaders, would give an additional box of chicken meat to a deboner at the end of a shift without prior notice. Many of the deboners complained about this practice to management and to the Union, specifically to the Union's business representative, Tom Clarke.[3]

Clarke had been assigned by the union to Royal Harvest since the first collective bargaining agreement was ratified. He made frequent visits to the plant and regularly involved himself in labor problems that arose there. Plaintiffs contend that after members of the deboning department complained to Clarke about the shift extensions, Clarke discussed the issue with management and told individual employees that the practice would be stopped.

The unscheduled overtime continued through the spring of 1985, however. On June 5, a group of deboners met after work and one of them, Hector Martinez, tele-

---

**1.** ·Royal Harvest is owned and operated by defendant Suffield Poultry, Inc.

**2.** This case originally was filed by seventeen plaintiffs, eight deboners and nine packers. The group's lawyer withdrew from representation of four of them (three packers) because of her inability to contact them. These four plaintiffs have filed no appeal of the district court's decision and therefore are no longer part of the case.

**3.** Whether management's new overtime practice was permitted by the collective bargaining agreement is not an issue on appeal.

phoned Clarke to tell him that the group was considering staying out of work the next morning in an attempt to persuade the employer to stop the overtime practice. Clarke testified in his deposition that he warned Martinez that the employees' refusal to start work the next morning would constitute a violation of the collective bargaining agreement and would subject them to discharge. Martinez stated in his deposition that no such warning was given. The contract did explicitly prohibit strikes and permitted Royal Harvest to fire employees who engaged in them.[4]

The next morning, at Martinez's request, Clarke came to the plant before the deboners' scheduled 6:30 a.m. starting time, and met first with the employees outside and then with management inside. At one point, he also brought two employees, Martinez and Henriquez, to meet with management. The employees wanted a firm commitment that the practice of requiring unscheduled overtime would be stopped, but management refused to discuss the issue unless the employees went to work.

The employees persisted in refusing to work. There is some conflict about whether Clarke and Meaders told the employees assembled outside the plant, or Martinez and Henriquez when they were inside, that they would be fired if they did not go in to work. Martinez, for example, testified in his deposition that Meaders gave such a warning, but Henriquez said he did not. *See also, e.g.,* Medero Deposition, App. II at 299 (Clarke told the employees that the company had said that refusal to work would result in discharge); Serrano Deposition, App. III at 381 (nobody told him he would lose his job if he did not go in to work); Alicea Deposition, App. I at 36 (Martinez had told him that he would be fired if he refused to work).

At some point, as the deboners were gathered outside the plant, plaintiffs claim that Clarke told them the only way for them to prevail was to engage more employees in the work stoppage. Clarke denies making such a statement, but seven of the eight deboners testified in depositions that they either heard or were told about such a statement.[5] As a result, some of the deboners recruited some of the packers when they came outside the plant for a morning or lunch break. All of the hourly employees who are parties to this appeal testified in depositions or affidavits that they either overheard Clarke's statement to the deboners or were told about it, and at least half indicated that they joined the strike only because of Clarke's comment.[6]

---

**4.** The contract stated, in pertinent part:

*ARTICLE 8—WORK INTERRUPTION—STRIKES AND LOCKOUTS, ETC.:*

*Section 1.* The Union and the employees agree that they will not during the term of this Agreement for any reason including an actual or alleged unfair labor practice within the meaning of the National Labor Relations Act, assist, authorize, cause, condone, encourage, permit, support, threaten or participate in any strike, walkout, sitdown, slowdown, boycott, picketing, work stoppage, refusal to work or any interference in any form or manner with the operations, business or any of the functions of the Employer.

*Section 4.* ... The Union and the employees agree that in the event any employee or employees engage or participate in any of the conduct described in Section 1 of this Article, directly, indirectly or by any means whatsoever, including a refusal to cross any picket line on Employer premises, the Employer may discipline or discharge said employee or employees....

**5.** For example, Hector Martinez testified that Clarke told the employees that "for us to undo what we were doing, we needed more people

out," App. II at 219; Henriquez testified that Clarke told the employees "[i]f more people backed us up we could come up with something good," App. II at 186; Wilson Rivera recalled Martinez reporting Clarke's statement that they "needed more people to win the case, to have more strength," App. III at 316; Santana reported hearing Clarke say that more people were needed to win the strike, App. III at 354.

**6.** For example, at her deposition, Wilma Santos reported hearing Clarke tell Hector Martinez that more people were needed "because with more people behind them they could do a lot more for them," App. III at 360, and she said she joined the strike because of that statement. *Id.* at 367. She elaborated in her affidavit: "He told Hector at that time that more people were needed to join the 'strike' to make everything turn out all right. Tom Clarke said that more people needed to join the 'strike' in order to cause the plant to stop operating so that the employer would have to deal with us." App. III at 436.

Torres stated in deposition that "I hear him tell them that the more people we have outside

Richard Abdow, the Union's president, arrived at the plant at Clarke's request during the morning. He met with management and then told the employees outside the plant that they had been fired for engaging in a "wildcat strike." The union subsequently secured the company's agreement to rehire some of the workers, and of the 17 employees fired, six were rehired. The hourly workers, however, lost their seniority and were paid as new employees.

Plaintiffs hired a lawyer, who asked the Union to investigate and grieve various issues, most of which were related to the work stoppage. The union declined to do so, and plaintiffs then filed this suit under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, claiming that Royal Harvest had breached the contract by, *inter alia*, disciplining them without good cause. They further claimed that the union had violated its duty of fair representation ("DFR") by arbitrarily failing to process their grievances, including those concerning their discharges, failing to furnish copies of the collective bargaining agreement, and misrepresenting the possible repercussions of a work stoppage, thereby inducing and/or encouraging employees to strike in breach of contract.

The district court granted summary judgment for defendants on all claims. Plaintiffs challenge that judgment with respect to only one issue: whether the union, through Clarke's statement about the need to involve more employees in the walkout, breached its duty of fair representation by misleading the workers into striking.

### II.

A labor union has a statutory duty of fair representation " 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " *Breininger v. Sheet Metal Workers Int'l Ass'n*

*Local Union No. 6,* —— U.S. ——, 110 S.Ct. 424, 429, 107 L.Ed.2d 388 (1989) (quoting *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967)); *Teamsters Local Union No. 42 v. NLRB,* 825 F.2d 608, 611 (1st Cir.1987). Plaintiffs contend that the Union breached this duty when Clarke told the deboners that they possibly could "win" their strike against Royal Harvest if enough employees joined the walkout. This conduct was arbitrary and in bad faith, they claim, because the collective bargaining agreement unequivocally prohibited strikes, and the Union knew that management was taking a hard-line position on the no-strike provision. Moreover, with regard to the hourly workers, Clarke's comment was discriminatory because it encouraged them to join the strike for the ostensible purpose of helping the deboners; thus, Clarke sacrificed the hourly employees for the benefit of the deboners.

The Union offers multiple reasons why plaintiffs have failed to establish a fair representation violation. First, it claims that to prove a DFR breach by the union, the plaintiffs must show that Royal Harvest discharged them in violation of the collective bargaining agreement, which they cannot do. Second, even if a DFR claim is viable without a concomitant breach of the contract by the employer, there can be no DFR violation for misrepresenting the consequences of striking, because the risks of striking are a matter of universal knowledge rather than information within the exclusive knowledge of the union. Third, even if misrepresentations about striking are actionable, Clarke's statement was not a misrepresentation but simply a truism; or, at worst, it was negligent, an insufficient basis for a DFR suit. Fourth, plaintiffs cannot show that they were treated differently from other individuals or groups of union members, a requirement for a duty of fair representation claim. Finally, Clarke's statement did not

---

gathering together is the more chances we have to fix up the situation." App. III at 397. Rodriguez said he was influenced to join the strike by Clarke's statement that "[t]hey needed more people, so the more people they got the stronger they got and they were better." App. III at 329.

Arocho said he stayed out of work "because I heard Tom Clarke saying to Hector and Cristobal that they needed more people." App. III at 435. *See also* Negron Deposition, App. III at 308; Felix Martinez Deposition, App. II at 195.

cause plaintiffs to strike, and therefore may not serve as the basis for a DFR claim.

In our view, this case may be properly analyzed only after dividing the plaintiffs into two groups, the deboners who planned the work stoppage and the packers who were drawn into the conflict after it already had begun. With regard to the deboners, we conclude that the record, even when viewed in the light most favorable to the plaintiffs, supports the district court's grant of summary judgment for the union. The record does not support judgment as a matter of law against the hourly workers, however, and we find that a trial is necessary on their claims. We discuss each of these conclusions in turn.

■ A. *The deboners.* Our problem with the deboners' claims is that the record demonstrates that Clarke's alleged misrepresentation was made *after* those workers already had refused to begin their shifts; his comment therefore neither could have encouraged the deboners to strike nor resulted in their discharge for refusing to work.

We acknowledge that there is some inconsistency in the record concerning the timing of Clarke's statement. Alicea put the time at 8 a.m. and Martinez estimated 9 a.m. Both estimates, however, are long after the deboners' 6:30 a.m. starting time, and testimony from some hourly workers also indicates that the comment was made well after the deboners decided to stay out of work. For example, Torres, who joined the strike at lunchtime, testified that she heard Clarke tell the deboners that "the more people we have outside gathering together is the more chances we have to *fix up* the situation." App. III at 397 (emphasis added). Arocho stated in his affidavit that he heard Clarke make the comment at "the morning breaktime." *Id.* at 434.

Significantly, plaintiffs do not allege that the statement was made before 6:30 a.m., and their papers both in the district court and on appeal reflect a recognition that the statement was made later. *See, e.g.,* Plaintiff's Objections to Magistrate's Report, at 17 ("Many of the plaintiffs, specifically those who were hourly employees, were not initially engaged in the strike, and testified that they joined the strike as a result of Mr. Clarke's statement."); Appellant's Brief at 10 (recounting Martinez' testimony that the plant still was operating although "most deboners were already out" as a reason why Clarke made the statement that additional strikers were necessary). Thus, the record is without meaningful dispute on the primary storyline in this case— that the frustrated deboners decided to stay out of work, either regardless or unaware of the consequences, and Clarke then informed them that their only hope of prevailing was to add to their ranks by recruiting co-workers who were on the job. The ambiguities in the record on the precise timing of Clarke's statement do not, we conclude, rise to the level of a *material* issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("[T]he requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

Because the alleged misrepresentation occurred after the deboners decided to strike, it could have had no causal effect on their subsequent discharges and therefore may not serve as the basis of a fair representation claim. *See Acri v. International Ass'n of Machinists,* 781 F.2d 1393, 1397 (9th Cir.1986); *Anderson v. United Paperworkers Int'l Union,* 641 F.2d 574, 578–80 (8th Cir.1981); *Deboles v. Trans World Airlines,* 552 F.2d 1005, 1017–20 (3d Cir. 1977). We do not decide whether plaintiffs' allegations *would have* stated a viable DFR claim had Clarke's statement occurred earlier.[7]

---

7. The deboners do not contend that, in the absence of Clarke's statement, they would have returned to work at some point after the strike had started in an effort to preserve their jobs. Even if they had made such an allegation, however, they still would have failed to establish a causal connection between the statement and their discharges because there is no evidence that Royal Harvest would have retained any employee who participated only temporarily in the work stoppage.

B. *The packers.* Taking the facts in the light most favorable to the plaintiffs, there is no doubt that Clarke's statement caused some, if not all, of the hourly workers to join the work stoppage. *See supra* at note 6. We therefore must consider whether the union may be held reponsible for a breach of its fair representation duty based on his comment and its results.

We reject easily the union's assertion that a DFR claim against the union is dependent upon a finding that the employer breached the collective bargaining agreement. This position has been emphatically rebuffed by the Supreme Court in a recent decision, *Breininger*, 110 S.Ct. at 432–33.

We also disagree with the union's argument that plaintiffs fail to establish a DFR claim because they cannot show differential treatment. The union relies on *NLRB v. Local 299, Int'l Brotherhood of Teamsters*, 782 F.2d 46, 51–52 (6th Cir. 1986), in which the court concluded that "the duty of fair representation is implicated only when an individual or group is treated differently by a union—either through discriminatory, bad faith, or arbitrary conduct—than another individual, group or the collective."

We need not delve into the merits of the Sixth Circuit's restricted view of DFR law because the packers here have alleged that they were disadvantaged as a class by the union's bad faith conduct. They stress that Clarke's comment encouraged a group of employees who were not involved in the overtime dispute to join the strike, putting their jobs in jeopardy for the sole purpose of improving the deboners' situation. While the deboners had everything to gain and nothing to lose from increasing the number of strikers, the packers had everything to lose and nothing to gain. We think the kind of allegation made here, that the interest of one group of employees was subordinated to that of another group, falls within even the Sixth Circuit's limited view of a fair representation claim. *See Local 299*, 782 F.2d at 51 (" '[I]t must be the duty of the representative organization "to serve the interests of *all* members without hostility or discrimination toward any...." ' ") (emphasis added) (quoting *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n. 14, 76 L.Ed.2d 476 (1983) (quoting *Vaca v. Sipes*, 386 U.S. at 177, 87 S.Ct. at 910)). Moreover, it is consistent with our own precedent to recognize the packers' claims. *See Teamsters Local Union No. 42*, 825 F.2d at 611 ("[A] union may not, without a legitimate purpose, take action favoring some of its members at the expense of others.").

We therefore need to consider the Union's other defenses, which focus on the particular content and context of Clarke's comment. A number of courts have recognized that union misrepresentations may serve as the basis for fair representation claims. *See, e.g., Bautista v. Pan American World Airlines*, 828 F.2d 546, 550 (9th Cir.1987); *Swatts v. United Steelworkers of America*, 808 F.2d 1221, 1225 (7th Cir. 1986); *Anderson*, 641 F.2d at 577–80; *Deboles*, 552 F.2d at 1017–20. *See also Warehouse Union, Local 860 v. NLRB*, 652 F.2d 1022, 1025 (D.C.Cir.1981) (failure to inform actionable in certain circumstances). Although these cases specifically addressed *intentional* union misrepresentations designed to induce members to join a strike or approve a collective bargaining agreement, the principle underlying them is applicable whenever a union misstatement is sufficiently egregious to be considered "arbitrary" or in "bad faith," which are the standards set by *Vaca* for establishing a DFR violation. Holding a union responsible for serious misrepresentations that lack rational justification or are improperly motivated is consistent with the union's obligation to deal honestly and fairly with its members. *See generally Retana v. Apartment, Motel, Hotel & Elevator Operators Union, Local 14*, 453 F.2d 1018, 1024 (9th Cir.1972) ("The duty of fair representation 'arises out of the union-employee relationship and pervades it.' " (quoting *Nedd v. United Mine Workers*, 400 F.2d 103, 106 (3d Cir.1968)). *Cf. Montplaisir v. Leighton*, 875 F.2d 1, 3 (1st Cir.1989) (where Civil Service Reform Act governed,

employees could not sue union in district court for poor advice; "that would have been a 'fair representation' claim, and barred [under CSRA]").[8]

In asserting that the specific statement at issue here is not actionable as a misrepresentation, the Union makes four primary arguments. First, it claims that Clarke merely stated a truism—that a successful strike requires the participation of the greatest number of employees—and, because he never said the workers could strike free of consequences, there was no misrepresentation. Second, the Union emphasizes that the workers either knew that their contract permitted discharge for striking or had access to that information, and the union may not be held liable for a misrepresentation unless the statement is based on information unavailable to the workers. Third, it asserts generally that misrepresentations concerning the consequences of striking simply are not actionable because of the unique pressures associated with strikes. Finally, the Union claims that Clarke's statement was, at worst, negligent and therefore an insufficient basis for a DFR violation.

The Union relies in particular on the Seventh Circuit's decision in *Swatts*, a case in which workers had complained, *inter alia*, that union officials failed to warn them they could be fired for striking and misrepresented the company's right to hire permanent replacements. In affirming summary judgment for the union, the Seventh Circuit observed that the employees improperly sought to impose liability on the union for withholding information that was readily accessible to them, or to any member of the general public—"that strikers sometimes lose their jobs because employers find replacements to fill their slots."

808 F.2d at 1224–25. The court suggested that a union should be held liable only if it either made an affirmative misrepresentation or failed to make known information within its exclusive control.[9]

In the strike setting, however, the *Swatts* court went even further in limiting potential fair representation claims, expressing reluctance to find a violation even when there has been an affirmative misstatement:

> [E]ven assuming that some misstatement might have occurred, every inaccuracy should not form the basis of a federal suit. A strike often presents unique pressures. The atmosphere may be tense, charged and confused. The situation is intensely adversary. Decisions and statements are sometimes made in haste, under pressure and in the belief that the other side is disseminating manipulated or distorted information to which a response is required. Union leaders, in exhorting the membership, may voice opinions that later prove inaccurate, or make claims that turn out to be hyperbole. So long as such statements are not intentionally misleading and are not of a nature to be reasonably relied upon by the membership—rather than discounted as partisan exhortation delivered under conditions of conflict—they may not rise to the level of invidious actions barred by the duty of fair representation. To conclude otherwise would have a chilling effect on the right to strike itself by instilling a fear of unjustifiable lawsuits. We emphasize that we do not condone fabrications designed to mislead the membership. But there must be a demanding standard for measuring such violations.

**8.** Some courts have discussed whether the duty of fair representation applies only to union dealings with the employer and not to internal policies and practices. *See Anderson v. United Paperworkers Int'l Union,* 641 F.2d 574, 576–78 (9th Cir.1981). *See also Richardson v. United Steelworkers of America,* 864 F.2d 1162, 1167 n. 2 Without question, this case involves "dealings with the employer," and we therefore do not discuss the limits of the duty's application.

**9.** The *Swatts* court contrasted its own case with *Warehouse Union, Local 860 v. NLRB,* 652 F.2d 1022 (D.C.Cir.1981), in which the union had failed to advise clerical workers that the employer had threatened to eliminate their unit if they persisted with their demand for a wage increase. The union continued to pursue the raise, it was granted, and shortly thereafter the employer terminated the clerical department. The D.C. Circuit held that the union breached its duty of fair representation.

*Id.* at 1225. *See also Bautista,* 828 F.2d at 551.

We agree with the Seventh Circuit that courts must be wary of finding a fair representation violation based simply on ill-fated advice from union officials, particularly when the issue is whether and how to conduct a strike. A union must be allowed a "wide range of reasonableness" in serving the unit it represents, *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), and the "complete satisfaction of all who are represented is hardly to be expected," *id.* The facts of this case are significantly different from *Swatts,* however, and we question whether the Seventh Circuit's caveats are relevant in this context.

In *Swatts,* the alleged misrepresentations came in the midst of a *union* -sponsored strike where the situation was "intensely adversary" and the union was responding to a letter from the employer announcing the company's right and intention to hire replacements. This case, in contrast, involved a wildcat strike that the union assertedly tried to discourage. There was no attempt by management to position itself between the union and its members, and thus no manipulated or distorted information to which the union had to respond to retain strike support. Clarke had met several times during the morning of the strike with company officials, and the atmosphere was neither hostile nor charged. It seems to us there is far less reason to indulge union misstatements concerning strikes in the absence of the heated conflict described by the court in *Swatts.* In non-adversarial circumstances, we would expect the union's statements to be more carefully considered, and it therefore seems appropriate to hold the union to a stricter standard of accuracy. *Cf. Thomas v. United Parcel Service,* 890 F.2d 909, 916 (7th Cir.1989) (" 'The nature of the duty of fair representation which a Union owes to its members is determined by considering the context in which the duty is asserted.' ") (quoting *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1519 (11th Cir.1988)).

In any event, even if the principles of *Swatts* were applicable here, we think a jury properly could find that the union exceeded the limits of its discretion. Plaintiffs do not allege simply a failure to warn about the consequences of striking. Clarke made an affirmative comment that fairly may be interpreted as assuring the workers that there was a chance of success if more employees joined the walkout. And, most significantly, the record permits a finding that this statement was, rather than a slight inaccuracy, an assertion with virtually no chance of being true. Union president Abdow testified in deposition that "[i]t was common knowledge among our staff" that involving more employees in the strike after the deboners had refused to begin their shifts "would be walking people out of work, out of their jobs." He continued:

> Especially knowing management and their position. Knowing it and understanding it and saying bringing more people out to help would be just devastating. It was a hardship as it was without involving another dozen or two dozen people.

App. I, at 14–15. Thus, according to Abdow, the "truism" uttered by Clarke was inapplicable in this situation; more workers involved inevitably would lead not to a better chance of success but, rather, to more discharges.

This case also arguably involves information that was in the exclusive possession of the union. As the longtime liaison between the company and the workers, Clarke presumably had the best knowledge of both the company's attitudes and the meaning of the contract. In fact, the collective bargaining agreement provides that Clarke, as the union's business agent, is the only person qualified to interpret the agreement for the Union. Thus, Clarke was singularly prepared to understand the futility, and potential harm, in encouraging the packers to join the deboners' work stoppage.

In addition, from all that appears in the record, the workers had no basis for recognizing the falsity of Clarke's statement. Even if some of the hourly workers knew,

or should have known, that the collective bargaining agreement forbade striking, they did not know from the contract that discharge was inevitable; the relevant provision stated only that joining a strike *may* lead to discipline *or* termination. The record viewed in plaintiffs' favor shows that the packers on the day of the walkout were not told that management had vowed to fire any striking worker, or that the deboners already had been fired. In light of Clarke's evidently superior knowledge, it was more than reasonable for the workers to rely on his implicit statement that increasing the number of strikers was a strategy that could work with Royal Harvest.

In every respect, therefore, this is a case in which the union arguably held an upperhand position vis-a-vis the employees, and took unfair advantage of it. We think a jury could find that, in focusing singlemindedly on the needs of the deboners and disregarding the welfare of the packers, Clarke acted in bad faith toward the packers. Alternatively, we think a jury could find that, in suggesting that more workers join the strike despite what he knew about management's attitude, Clarke acted arbitrarily by putting the packers' jobs at risk when there was no rational chance of succeeding with the strategy. Because a jury could find that Clarke's misrepresentation was either an arbitrary or bad faith abandonment of his obligation to protect the interests of *all* those whom the Union represents, we hold that the district court erred in granting summary judgment on the packers' claims.

## III.

Plaintiffs argue as an alternative theory that Clarke's actions amounted to a tortious interference with the collective bargaining agreement, and as such breached the duty of fair representation. Plaintiffs seem to offer this theory as a backup in case we were to reject more traditional approaches to analyzing fair representation claims. Even if this theory were properly preserved, which we doubt, it appears redundant in the circumstances of this case.

The deboners' claims would suffer from the same causation problem under a tortious interference analysis as we described above, and we have found that the packers' claims fall within traditional modes of analysis. We therefore do not address whether there may be a tortious interference variation of a fair representation claim.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*